## SMITH v. SMITH.

Circuit Court, Lake County.

October 22, 1953.

Hunter & Hunter and Roy P. Hamlin, all of Tavares, for plaintiff.

C. E. Duncan, Tavares, and T. C. Cork, Clermont, for defendant.

T. G. FUTCH, Circuit Judge.

This case is a fraternal bout over a comparatively small segment of the "root of all evil"—money.

These brothers are each highly intelligent, yet one, the defendant, L. Neal Smith, is highly educated, while the plaintiff, Alexander Smith, had practically no formal education. Neal possesses the advantage of a vocabulary which is meaningless to Alexander— by education and training, his wits in business matters pass those of Alexander as did the old fashioned "pay car pass the tramp." While Alexander pondered mechanical possibilities, Neal pondered financial possibilities based on Alexander's mechanical aptitude.

Defendant's (Neal Smith's) testimony is so garrulous, inconsistent, conflicting and confused that it has proven hard to analyze and of little value in determining the issues.

There can be no question as to who called the dance from the time it started in 1947 until the time came for the final hop in

December, 1950. The defendant, Neal Smith, controlled the money. He had it in *his personal bank account*. Though the operation did many thousands of dollars worth of business, it never had a bank account. All the money was handled by defendant, Neal Smith, through his personal bank account.

It all started with a lawn mower. Neal visited his brother, Alexander, in Sanford. Alexander, having devoted his talents to the services of our country during the years of the second world war, found himself in rather hard circumstances when Neal visited him at his home in Sanford in 1947. He was, however, making and selling, in a modest way, a novel lawn mower. He had sold a half interest in the machine for $500 so as to seek patent rights. The machine caught the fancy of Neal and kindled in his alert financial mind visions of profit. He proposed to his brother a manufacturing enterprise for the machine but Alexander felt he could not accept because of his obligation to the man who had come to his rescue and gambled $500 on a patent for one-half interest. Neal went away, but soon returned with an ultimatum to come on in with him or he would make and sell the machine on his own, regardless of Alexander and his friend. The friend capitulated, took back his $500 and stepped out of the picture. Neal told Alexander that he, too, had a mowing machine, but we hear no more of it. He both admits and denies that Alexander took one of his machines to Mt. Verde as a model. Alexander says he did. I accept the word of Alexander on this point (Neal is positive that no part of Alexander's original machine was embodied in the machine which they finally put into production.)

The rights to manufacture the machine were finally sold by these two brothers on a royalty basis.

After the sale was completed, the December 31, 1950 balance sheet showed the business had on hand assets consisting of an inventory of mowers, parts and supplies amounting to $61,736.83— against which were accounts payable in the sum of $843.46. The investment accounts of the parties on the same date shows the credit balance of Alexander to be $19,225.93 and of Neal to be $41,667.44 (more about this later).

While the contract for the sale of the manufacturing rights called for the purchaser to take over and pay for the inventory, defendant, Neal Smith, by some separate trade with the purchaser retained the inventory as his personal property with right to continue manufacturing and selling the machines until the inventory had been exhausted. On February 25, 1953, defendant, Neal Smith, testified before this court that he had used "every bit" of that inventory

in the manufacture of "Snappin Turtle" lawn mowers. (Tr. p. 88.) On October 12, 1953, he testified before this court that a large quantity of the inventory was yet on hand and could not be used.

The plain truth doubtless is that Neal Smith made a secret contract (that is, secret from Alexander) with the purchaser to continue the manufacture of these machines on his own and to the exclusion of his brother, Alexander, from his share of the profits derived from the use of the patent of which he is shown to own a one-half interest. Prior to February 25, 1953, the inventory had been "every bit" used. From the number of decks and skid pans shown by the inventory, more than 700 mowers must have been assembled from the inventory. From the facts shown by the record it is evident that defendant took over the inventory because he saw a good profit to be made and not for salvage purposes, and the court so finds.

Defendant was to furnish all tools. Certain dies were secured for stamping out parts of the machine. These dies cost $12,125, but did not become the property of this concern. Only their use by the maker for the benefit of this concern became its property. This use was sold with the right of manufacture of the "Snappin Turtle" to Southern Saw Works, Inc. There is no depreciation on these dies. The manufacturer is obliged to keep them in repair or make new ones if required to produce the product for which the die is designed.

With the exception of this item of the cost of the dies, I accept and approve the audit of Henry W. Sheppard in toto. The cost of the dies should not have been deducted from the partnership estate.

The record of testimony in this case consists of more than 200 pages to say nothing of the pages of exhibits filed by the respective parties. Much of this testimony and many of the exhibits have no bearing whatsoever on the questions to be determined. Very few objections to testimony and exhibits were interposed and, like the brook, they continued to flow.

The questions to be resolved as I understand the case are six in number, to-wit—

(1) Was there a partnership between the plaintiff and the defendant?

(2) What was the interest of the respective parties in the business?

(3) Are dies for stamping or cutting out parts of a machine "tools" for the manufacture of the product in question?

(4) What is the interest of each of the parties in the assets of the business?

(5) Has the defendant been guilty of such overreaching as to require this court to assess attorney's fees and expert witness fees against him?

(6) What amount is now due plaintiff by defendant?

Question (1) must be answered in the affirmative. Defendant, in his testimony (Tr. p. 48) says "we were working under a *full* partnership agreement." (Emphasis supplied.) He does not claim a limited partnership. It was defendant's proposition that they pool their efforts and talent—that he, defendant, would finance the business and furnish the tools and building and all profits would be shared equally after payment of expenses, return of defendant's money with interest and payment of depreciation on tools, equipment and building. Defendant says frankly that he expected plaintiff to pay half the losses if any were incurred. (Tr. 67, 68-70, 71, 72.)

Beyond all doubt the partnership was one in which plaintiff and defendant had equal interests. The fact that the partnership borrowed money, tools, and equipment from defendant does not change this fact any more than if the borrowing had been from a third party. Thus, we have the answer to question (2).

Question (3) must be answered in the affirmative. The dies for which $12,125 were advanced by the defendant were tools for cutting out certain parts of the machine which the parties were manufacturing. There was no depreciation to be charged against them and they were sold along with the manufacturing rights. See plaintiff's exhibit no. 13—letter from Commercial Shearing and Stamping Co. to Southern Saw Works, Inc. dated September 19, 1950.

Question (4) is answered by the answer to question (2), as reflected by the audit of Mr. Sheppard and his testimony on page 57 of the transcript of testimony in behalf of the plaintiff.

Question (5) is more difficult to answer but a reading of the entire testimony reveals the certain fact that defendant used threats of withdrawing capital for the purpose of forcing his will upon plaintiff at every turn of events. Plaintiff did not dare differ with defendant for fear of having the working capital, tools, equipment and buildings withdrawn. This plan of procedure had succeeded for defendant from the start and he thought it would continue to the end and enable him to make such settlement with plain-

tiff as he pleased. There is no question that he was arbitrary and dictatorial in his proffer of final settlement and forced the plaintiff into court to obtain a settlement. Defendant has maintained throughout the trial that he had a right to take a one-sixth interest from plaintiff and give it to his son-in-law. Of course, he had no such right. It is significant that the record nowhere shows that the son-in-law ever in fact received the one-third interest. In fact, defendant says "he has never accepted it."

It is true this case has been pending before this court a long time, but that is not the fault of either party. It has been due in part to the illness of one of the attorneys in the case and in part to the fact that another of the attorneys is a member of the Florida legislature, and time had to be taken out for him to attend a session of that body.

I find that plaintiff's attorneys' fees and pay for expert witnesses, accountants and other costs should be paid from the partnership estate before any division of the assets is made.

The cost of the dies will be charged to the account of L. Neal Smith.

After the investment accounts of the parties (auditor's exhibit D) have been adjusted, in accord with these findings, plaintiff's attorneys' fees, fees of plaintiff's expert witnesses, auditors, and other necessary costs and expenses incurred by the plaintiff in and about this cause will be first paid from the partnership estate, and any balance remaining will then be divided equally between the parties, share and share alike.

Defendant will be required to pay to the plaintiff interest on the amount due plaintiff (as above determined) from December 31, 1950 at the rate of 6% per annum.

Defendant will be allowed to deduct from the amount due by him to the plaintiff the sum of $5,830.16 being the principal sum represented by note of plaintiff, dated October 1, 1949, made payable to and held by the defendant, together with interest on said principal sum, from August 20, 1949 to and including December 31, 1950.

Interest charges are allowed as above stated because defendant took over the assets December 31, 1950 and should have accounted to plaintiff at that time for his share of the assets of the partnership estate.

I find the sum of $5,000 to be a reasonable fee to be allowed plaintiff for his attorneys' fees.

Since the evidence in this case shows that the defendant took into his possession and disposed of all, or practically all, of the assets of the partnership on December 31, 1950, the decree will be so formed as to enter personal judgment against the defendant, L. Neal Smith, and in favor of the plaintiff, Alexander Smith, in accord with these findings, including principal and interest, attorneys' fees, compensation for expert witnesses, auditors and other costs properly incurred by him in and about the prosecution of this cause. Plaintiff's counsel will prepare a decree in accordance with these findings.